Filing # 105729378 E-Filed 04/01/2020 01:01:42 PM

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:
DIVISION:

**RUTH CATHERINE ESQUIVEL**,

     Plaintiff,

v.

**ALLERGAN SALES, LLC,**
**a foreign limited liability company**, and
**RICARDO E. MOJICA,**

     Defendants.

_____/

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff, **RUTH CATHERINE ESQUIVEL**, sues the Defendants, **ALLERGAN**

**SALES, LLC, a foreign limited liability company**, and **RICARDO E. MOJICA**, and alleges

the following:

### GENERAL ALLEGATIONS

1.    This is an action for damages in excess of $30,000, exclusive of attorney's fees,

costs, and interest.

2.    All conditions precedent to the filing of this action have been performed or have

occurred.

3.    At present, the Plaintiff, **RUTH CATHERINE ESQUIVEL f/k/a Ruth**

**Catherine Holshouser** (hereinafter "Ms. Esquivel"), is a resident of, and permanently domiciled

in California; at all times material to this *Complaint*, she was a resident of Orange Park, Clay

County, Florida.

4.    All medical care and treatment rendered to Ms. Esquivel upon which the claims

set forth herein are based took place in Jacksonville, Duval County, Florida.

5.      The Defendant, **ALLERGAN SALES, LLC** (hereinafter "Allergan"), is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

6.      Allergan is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

7.      Allergan may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

8.      At all times material hereto, the Defendant, **RICARDO E. MOJICA** (hereinafter "Mojica") was and is a resident of, and permanently domiciled in, the State of Florida, to-wit, at 2425 Northwest 26th Street, Boca Raton, Palm Beach County, Florida.

9.      Allergan and Mojica's co-conspirators, whom Allergan and Mojica aided and abetted, were: (i). Loren Z. Clayman, M.D. (hereinafter "Clayman Senior"); (ii). his son, Mark A. Clayman, M.D. (hereinafter "Clayman Junior"); (iii). and their medical professional association, Loren Z. Clayman, M.D., P.A. (hereinafter the "Clayman Practice"). Hereinafter, Allergan and Mojica's co-conspirators will be collectively referred to as the "Claymans."

## FACTUAL ALLEGATIONS

10.     For at least 15 years, Allergan has known that Clayman Senior, Clayman Junior, and the Clayman Practice were lying to hundreds of female patients by telling them they had ruptured, deflated, or leaking saline breast implants so the Clayman Practice could collect free

implants and surgical fees for replacement surgeries. Allergan knew the Claymans were lying because: (1). Allergan's own Southeast Regional Sales Director, Mojica, through the sales representatives working under him, first proposed to, and repeatedly encouraged, his Florida plastic and cosmetic surgery customers (including the Claymans) to lie to their patients and on breast implant warranty claim forms about the condition of saline implants in order to obtain free breast implants and surgical fees; (2) As Allergan received a breast implant warranty claim form signed by the patient and Clayman Senior or Junior for each warranty claim made by the Clayman Practice, Allergan was aware that the Clayman Practice was lying to its patients about the condition of their breast implants; (3). for each warranty claim made by the Clayman Practice, Allergan examined the implants at issue and found that they were not defective; and (4). the Clayman Practice's saline breast implant failure rate was markedly higher than the failure rate of 1.5% for each year after surgery that Allergan's own studies of its saline breast implants showed.

Despite this knowledge, Allergan paid every saline breast implant warranty claim made by the Clayman Practice—5,278 claims—between January 1, 2006 and December 31, 2015. Allergan paid these claims because the Clayman Practice purchased large quantities of breast implants, other medical devices, and pharmaceuticals from Allergan, and Allergan wanted to encourage and promote the Clayman Practice's continued purchase of their products. As demonstrated by the multiple criminal and civil proceedings against Allergan within the past 10 years, it is apparently an integral part of Allergan's marketing plan to pay (bribe) physicians to use its products. For these reasons, Allergan is liable to Ms. Esquivel for aiding and abetting and conspiring with Clayman Senior, Clayman Junior, and/or the Clayman Practice.

### Allergan and McGhan/Inamed

11.    Donald K. McGhan worked at the laboratory where Dow Corning first made

breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

12.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time, the company was one of the largest breast implant manufacturers in the world.

13.    In March 2006, Inamed merged with Allergan, a multinational manufacturer of healthcare products in many different categories, including the following:  dermatology, central nervous system, eye care, women's health and urology, gastroenterology, cardiovascular diseases, infectious diseases, and aesthetics.  Among Allergan's products are Botox (therapeutic and aesthetic), Namenda, Restasis, Linzess, Bystolic, Juvederm, Latisse, Loestrin, Estrace Cream, Teflaro, Dalvance, Ozurdex, Optive, Viibryd, Liletta, and Saphris.  After the merger with Inamed, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

**Allergan's Breast Implant Warranty Scheme**

14.    After the merger, Allergan created Allergan Partnership Privileges (hereinafter "APP").[1]  APP provided members with rebates, sales growth rewards, a special online physician locator listing, priority customer service line access, preferred shipment status, and certificates and status displays; the purposes of APP was to leverage sales across its entire line of aesthetic products.  To become an APP Partner, a medical practice had to purchase at least three types of aesthetic products:  Botox (one of the company's most profitable products), a dermal filler (i.e., Juvederm), and breast implants.  APP had several tiers based upon the volume of Allergan aesthetic product purchases:  Bronze, Silver, Gold, Platinum, and Diamond; Diamond tier

---

[1]    As of January 31, 2020, Allergan discontinued the APP.

partners received the highest level of perks from Allergan.[2]

15.    Despite implementing the APP, in most regions Allergan's breast implants sales lagged behind those of its chief competitor, Mentor, which offered breast implants at lower prices.

16.    To increase the volume of breast implants sales, Allergan encouraged and approved regional sales directors in certain regions[3] to direct their sales representatives to expressly offer Diamond tier APP partners incentives that, crossing legal and ethical boundaries, *amounted to kickbacks and bribes*.  In some instances, they offered Diamond APP partners free travel and lavish non-educational parties in exchange for greater breast implant purchases.  In other instances, in exchange for increased breast implant purchases, representatives provided Diamond tier surgeons free implants and surgical fees by allowing them to make false breast implant warranty claims.

17.    In the false warranty scheme, in exchange for higher breast implant purchases, Allergan's sales and marketing representatives (including Mojica and those working for him) expressly directed Diamond tier surgery practices (including the Claymans) to falsely claim implants had spontaneously ruptured, deflated, or leaked so they could receive free breast implants and surgical fees under the warranty.  One effect of this scheme was that it facilitated "cover ups" by certain surgeons who falsely attributed poor breast surgery outcomes to ruptured, deflated, or leaking implants rather than careless surgical practices.    As such, these surgeons were able to make more money from poor surgical practices, as Allergan increased its percentage of the breast implant market despite Mentor's lower prices.

---

[2]    Allergan later added another tier to the top level, Double Diamond.

[3]    Among the known regions where the warranty scheme was encouraged were Southern California, Colorado, and Florida.

**The Clayman Practice**

18.    Clayman Senior was first licensed as a medical doctor in Florida on January 10, 1975.  On December 31, 1976, he completed a residency in plastic surgery, and he began practicing in Jacksonville, Florida.  Soon after establishing the Clayman Practice, he began performing breast augmentation surgeries.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

19.    After the FDA prohibited the widespread use of silicone breast implants in 1992, Clayman Senior began using saline filled implants exclusively.

20.    As of the early 2000s, the Clayman Practice began marketing its breast augmentation practice to patients of modest means.  To reach this population, the Clayman Practice advertised extensively in free local discount publications.  Furthermore, the Clayman Practice began charging less for breast augmentations than other local plastic surgeon; while most plastic surgeons charged between $5,000 and $10,000, the Clayman Practice charged only $3,750.  As a result, the Clayman practice became a high-volume breast augmentation plastic surgery practice.

**Ricardo E. Mojica**

21.    Between 2000 and 2006, Mojica worked as a surgical sales representative for Inamed/McGhan.  The products he sold were breast implants, facial implants, and injectable "fillers."

22.    In 2002, Mojica was promoted to the Southeast Team Field Trainer.

23.    In 2003, Mojica was named "sales representative of the year" by Inamed/McGhan for achieving $1,040,000 in sales, which was an increase of 37% from the previous year.

24.    After the merger with Allergan, Mojica was promoted to Southeast Regional Sales Director, for which his territories included Florida, Georgia, and South Carolina.  Mojica

6

held this position between 2006 and 2013. According to his personal LinkedIn profile, he was "responsible for leading and developing an elite 10-member sales team," of which he claimed the "foundation of our success was achieved through a collaborative and synergistic team culture." He also attributes his success as the Southeast Regional Sales Director to "helping team members achieve their individual goals and open collaboration channels to share effective practices."

25.    In reality, Mojica trained and directed his sales representatives to act in ways that previous managers had prohibited. Specifically, he trained and directed them to expressly offer Diamond tier APP partners non-educational parties and travel in exchange for increased implant purchases. He also trained and directed them to employ the breast implant warranty scheme (see paragraphs 14-17). Specifically, sales representatives were trained and directed to expressly offer Diamond tier partners free breast implants and surgical fees for false warranty claims in exchange for higher breast implant purchases.

26.    Soon after adopting these unethical and illegal sales practices, Allergan's breast implant sales volumes increased rapidly in Mojica's region, particularly in Florida, even though Mentor continued to offer lower prices on implants. As the volume of breast implant sales increased, the profit per pair of implants diminished, and the number of returned implants increased.

27.    In 2013, Mojica was promoted to Senior Director, Medical Education. In his new position with Allergan, Mojica was responsible for "building and leading a high-performing team responsible for development of the plastic surgery sales force and plastic surgeons." In this capacity, Mojica began training and directing sales representatives across the country to, among other things, employ the breast implant warranty scheme with Diamond tier partners.

### The Allergan/Mojica-Clayman Conspiracy

28.    Until the mid-2000s, the Clayman Practice purchased saline breast implants from Allergan's predecessor (Inamed/McGhan) *and Mentor*.  During this time, Clayman Senior began "covering up" his poor surgical practices by blaming post-augmentation complications on leaking, ruptured, or deflated implants.  Clayman Senior lied to his patients because he knew that by claiming that the implants were defective, he could divert blame for the complications away from himself.

29.    During a single year in the mid-2000s, the Clayman Practice made more than 40 warranty claims to Mentor.  In response, Mentor's quality assurance department contacted the regional sales manager and advised him that the high number of claims was indicative of <u>fraud</u>. Mentor asked the regional sales manager to meet with Clayman Senior and demand an explanation for the unusually high number of warranty claims.  Clayman Senior refused to meet with the sales manager.  As a result, Mentor permanently ended its relationship with the Clayman Practice, and Inamed/McGhan became the Clayman Practice's sole breast implant supplier.

30.    After Allergan acquired Inamed/McGhan in 2006, the company adopted the APP and installed Mojica as the Sales Director for the Southeast Region, which included Jacksonville, Florida.  Soon afterward, the Clayman Practice became a Diamond tier partner in the APP as a result of its high-volume purchases of Allergan aesthetic products such as Botox, Juvaderm, and Natrelle saline breast implants.

31.    Mojica directed his sales representatives to expressly offer the Clayman Practice an opportunity to participate in the breast implant warranty scheme.  With that, the Claymans had found in Allergan, through Mojica and his sales representatives, a partner willing to assist them in defrauding their patients.  Thereafter, Allergan and the Claymans developed a symbiotic

relationship built upon the mutual knowledge and understanding that the Claymans were lying to their patients about the condition of their breast implants to receive free breast implants and surgical fees in exchange for purchasing high volumes of aesthetic products from Allergan.

32.     Between 2006 and 2015 the Clayman Practice made the following warranty claims, for which Allergan made the following payments:

| Year | Warranty Claims | Warranty Payments to the Clayman Practice |
|------|-----------------|-------------------------------------------|
| 2006 | 84 | $   106,800 |
| 2007 | 76 | $   110,400 |
| 2008 | 150 | $   213,600 |
| 2009 | 261 | $   261,000 |
| 2010 | 521 | $   855,600 |
| 2011 | 866 | $1,420,000 |
| 2012 | 849 | $1,380,000 |
| 2013 | 798 | $1,330,000 |
| 2014 | 1,057 | $1,770,000 |
| 2015 | 616 | $1,090,000[4] |

33.     To make a breast implant warranty claim, surgery practices were required to return "defective implants" to Allergan, where members of the product surveillance department performed what they called *Laboratory Analyses*, a series of tests designed to identify root

---

[4]     The undersigned does not have records reflecting the number of breast implant warranty claims the Clayman Practice made to Allergan after 2015.

causes of ruptures, deflations and leaks. The product surveillance department would then generate *Laboratory Analysis* reports detailing their findings. [5]

34.     Nearly every *Laboratory Analysis* report for saline breast implants returned by the Clayman Practice found no evidence of a "loss of shell integrity, resulting in implant rupture or deflation," which was a requirement for payment under Allergan's warranty. Nevertheless, Allergan paid every warranty claim from the Clayman Practice between 2006 and 2015; this amounted to **5,278 warranty claims for a total of $8,537,400 in payments**.

35.     Allergan's own studies of its saline breast implants showed a failure rate that was markedly lower than the failure rate experienced by the Clayman Practice. According to this study, the failure rate for Allergan Natrelle saline breast implants was only 1.5% for each year after surgery.

36.     Allergan has had a deep financial motivation for paying the Clayman Practice's 5,278 warranty claims. Between January 1, 2008 and December 31, 2015, the Clayman Practice purchased 11,082 pairs of saline breast implants from Allergan, which made the Clayman Practice one of Allergan's top 10 breast implant customers in Florida. Furthermore, the Clayman Practice purchased a host of other aesthetic products from Allergan, including the following: Botox, Latisse, Juvederm, Kybella, SkinMedica, Vivate, and CoolSculpting (a product marketed by Zeltiq Aesthetics, which is a subsidiary of Allergan). Since Allergan adopted the APP, the Clayman Practice has essentially become a "one supplier shop." When a nurse employed by the Clayman Practice asked Clayman Senior why he believed Allergan would keep paying his breast

---

[5]     One important reason the Allergan-Clayman conspiracy went undiscovered for so many years was that Allergan did not as a matter of course provide patients with copies of their *Laboratory Analysis* reports.

implant warranty claims, he told her, "I know they're going to pay them all because I'm a Diamond level partner."

37.    During this same time period, other plastic surgery practices that were not APP Diamond tier partners had their saline breast implant warranty claims denied by Allergan, even though they made fewer than 5 warranty claims per year.

38.    Furthermore, to the best of the undersigned's information and belief, Allergan has devised an "off-balance-sheet" method of paying breast implant warranty claims.  Specifically, Allergan pays breast implant warranty claims through a captive insurance company created and owned by Allergan.[6]   When a manufacturer such as Allergan creates a captive insurance company, the manufacturer is provided a means of reclassifying otherwise taxable income from across its various divisions and subsidiaries as "premium payments" that go to the captive insurance company.   The formerly taxable income that is reclassified as "premiums" then accumulates within the captive, making it, essentially, a large "slush fund."   In the event the manufacturer uses the captive insurance company to pay a "loss," such as a breast implant warranty payment, the loss is not reflected in the manufacturer's balance sheets or filings with the Securities and Exchange Commission.  In addition, because the captive is not a third-party company, manufacturers with captive insurance companies are free to manipulate the claims process without outside interference.

**Allergan's Similar Course of Conduct Across Other Divisions**

39.    The breast implant warranty scheme is not the first instance in which Allergan has been implicated in a physician bribery scheme, as Allergan has been implicated in violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), <u>at least six times, resulting in Allergan</u>

---

[6]        *See*, https://opencorporates.com/companies/us_hi/206243D1.

<u>paying a total of $1.089 billion</u> in criminal penalties and civil settlements.

40.     The federal Anti-Kickback Statute prohibits anyone from

knowingly and willfully offer[ing] or pay[ing] remuneration (including any
kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in
kind to any person to induce such person—

        …

        (B) to purchase, lease, order, or arrange for or recommend purchasing,
        leasing, or ordering any good, facility, service, or item for which payment
        may be made in whole or in part under a Federal health care program[7]…

42 U.S.C. §1320a-7b(b)(2).

41.     Over the past ten years, Allergan was involved in the following:

        A.      **September 1, 2010**, Allergan was forced to pay $600 million in settlement

of criminal and civil complaints that included allegations of providing free physician

workshops and dinners, paying physicians to attend "advisory boards" promoting off-

label uses, and created Alphamedica, which administered a speakers bureau that paid

physicians $1,000 to allow sales representatives to shadow them at work.[8]

        B.      **September 15, 2010**, Allergan's Forest Laboratories division was forced

to pay a $313 million settlement of criminal and civil complaints that included allegations

of cash payments to physicians that the company described as "grants" and "consulting

---

[7]     Because the Clayman Practice's patients paid for their breast augmentation procedures
with cash (not under a Federal health care program), the Anti-Kickback Statute does not apply to
the Clayman scheme, and Plaintiffs assert no claim under the Anti-Kickback Statute. Plaintiffs,
however, allege the facts concerning Allergan's conduct in violation of the Anti-Kickback
Statute to show this Court that it is plausible that Allergan, consistent with its past criminal
conduct, engaged here in criminal conduct by conspiring with, and substantially assisting, the
Clayman Practice to perpetrate fraud upon its patients.

[8]     *See,* https://www.justice.gov/opa/pr/allergan-agrees-plead-guilty-and-pay-600-million-
resolve-allegations-label-promotion-botox; https://www.cbsnews.com/news/how-allergan-
sponsored-a-history-of-sausages-to-promote-botox-illegally/.

fees," expensive meals, and lavish entertainment to physicians to induce them to prescribe the drugs Celexa and Lexapro.[9]

      C.    **October 29, 2015**, Allergan's Warner Chilcott division was forced to pay a $125 million settlement in a case that included allegations of violations of paying doctors speaking fees to induce them to prescribe the drugs Asacol, Actonel, and Loestrin.[10]

      D.    **December 15, 2016**, Allergan's Forest Laboratories division was forced to pay a $38 million settlement in a case that included allegations of paying kickbacks to physicians to induce them to prescribe the drugs Bystolic, Savella, and Namenda.[11]

      E.    **June 29, 2017**, Allergan was forced to pay a $13 million settlement in a case involving allegations of providing valuable business consulting services, continuing medical education, and other valuable services to physicians to induce them to prescribe Allergan eye care products including Restasis, when other less expensive treatment alternatives were available.[12]

42.    Allergan's previous conduct demonstrates that its involvement in the breast implant warranty scheme was and is part of a larger course of conduct whereby the company's marketing plan includes bribing physicians to increase sales.

---

[9]    *See*,        https://www.justice.gov/opa/pr/drug-maker-forest-pleads-guilty-pay-more-313-million-resolve-criminal-charges-and-false.

[10]    *See*, https://www.wsj.com/articles/allergan-unit-to-plead-guilty-to-fraud-pay-125-million-1446139657/?mod=mktw.

[11]    *See*,    https://www.justice.gov/opa/pr/forest-laboratories-and-forest-pharmaceuticals-pay-38-million-resolve-kickback-allegations.

[12]    *See*, http://www.pietragallo.com/library/files/nevyas_allergan_press_release_final.pdf.

**Ruth Catherine Esquivel**

43.     On April 2, 2009, Ms. Esquivel first presented to Clayman Senior for a breast augmentation consultation.    At the time, she reported to him that she wanted an "increase in breast size," and that she wanted to be a size "Full B."    After a performing a very brief examination, Clayman Senior agreed to perform a breast augmentation for $3,750.

44.     Ms. Esquivel did not schedule the breast surgery at that time, but instead waited almost 4 years.  On March 12, 2013, she returned to the Clayman Practice and was seen again by Clayman Senior.   After performing another brief physical examination, Clayman Senior again agreed to perform an "Augmentation Mammoplasty areola" for $3,750.

45.     On March 29, 2013 she presented for her first breast surgery.   In the surgical intake form she wrote that her breasts were "too small," that the space between her breasts was "too wide," that her breasts were asymmetric in size and location, and that her breasts appeared to be "deflated."   According to the operative report of that date, Clayman Senior implanted Allergan Natrelle Style 68 High Profile 400cc saline implants, which he documented filling with 400cc of saline at each side "to give the patient her desired look,"   although he failed to document how much saline he used to inflate the implants.   Ms. Esquivel returned to the Clayman Practice for two follow-visits within a week of surgery.

46.     In May of 2013, Ms. Esquivel noticed a "tightness" in her right breast, which was also smaller or more painful than her left breast.  She called the Clayman Practice and scheduled an appointment for May 16, 2013.  Upon presenting to Clayman Senior on that date, she asked him if the problems she was having were the result of capsular contracture caused by compromise to her implants from bacteria or foreign matter from her previous surgery.  Clayman Senior told her that it was not capsular contracture, and he denied that any bacteria or foreign matter could have compromised her implant.   In his note in the patient follow-up ledger,

Clayman Senior documented that she reported that she was kicked in the right breast by her baby. However, Ms. Esquivel was not kicked by her baby, and she never told him that she had been.

47.    On November 13, 2013, Ms. Esquivel returned to Clayman Senior with complaints about the tightness, pain, and smaller size of her right breast compared to the left. After a brief physical examination, Clayman Senior told her that she had a deflation at her right breast implant that made it necessary to have another surgery to remove and replace both of her breast implants. In his patient follow-up ledger entry for November 13, 2013, Clayman Senior documented a contradictory basis for the recommended surgery, that she had "slight double bubble" on the right that made it necessary for her to have another surgery to remove and replace both of her breast implants.[13]   On November 13, 2013, Clayman Senior and/or Clayman Practice staff gave Ms. Equival a written surgical estimate that stated she needed to undergo a "Right replacement with adjustment; Replace left also."

48.    On December 2, 2013, Ms. Esquivel presented to the Clayman Practice for her second breast surgery. Upon arriving, Clayman Senior and/or Clayman Practice staff obtained an "Authorization for and Consent to Surgery or Therapeutic Procedures" purportedly signed by Ms. Esquivel that stated she was undergoing "Bilateral Replacement Augmentation Right Deflation, Right Capsule Release." A preoperative photograph taken that day demonstrates that Ms. Esquivel did not have a rupture, deflation, or leak at either her breast implants.

49.    In the Operative Report and OR Record dated December 2, 2013, Clayman Senior documented her preoperative diagnosis as "Right deflation" and "Right capsule." He also wrote that Ms. Esquivel "developed an increased firmness to her right breast and some change in shape

---

[13]    "Double bubble" is a breast augmentation surgical complication that is not related to defective implants.

after being kicked in the breast by her new born."  In the body of the operative report, Clayman Senior documented that upon dissecting down to the right implant capsule, "the implant was removed and found to have a leak at the valve, with a blood stained piece of fatty tissue within the valve-fill channel area, a few tissue particles floating within the implant fluid as well."  He also wrote that there was a "capsular injury, with a 5cm horizontal tear along the inferior aspect of the breast at the presumed sight of injury."  He went on to write that a "second capsule tear was identified at the most superior aspect of the pocket involving the pectoralis muscle."   The left implant was found to be intact, but it, too, was removed.  Both implants were Allergan Natrelle Style 68 High Profile 465cc saline breast implants, which he documented inflating with 415 cc's of saline on the right, and 440 cc's of saline on the left.

50.    On or about December 2, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Esquivel sign an Allergan breast implant warranty claim that stated she had a rupture, deflation, or leak at her right breast implant due to "[p]articles in valve," and that she was as a result required to undergo surgery to remove and replace both of her implants.[14]  Pursuant to Allergan's warranty, the Claymans sent the removed implants and the completed warranty claim form to Allergan's Product Support Department, from which it was forwarded to the Device Analysis Laboratory.   After conducting an analysis of the implants, the Device Analysis Laboratory found no basis for the claimed *spontaneous* rupture, deflation, or leak at the right breast implant.  Nevertheless, on March 3, 2014, the Clayman Practice received a warranty check for $2,400 from Allergan in relation to the removed implants.

51.    Ms. Esquivel returned to the Clayman Practice to have her sutures removed on December 9, 2013.  She never returned to the Clayman Practice after that date.

---

[14]    Under the terms of the Allergan breast implant warranty, benefits are not payable for capsular contracture or damage to an implant from trauma.

52.     On June 29, 2016, Ms. Esquivel presented to a different plastic surgeon.  The surgeon found that her implants had been placed at a subglandular plane rather than a submuscular plane, that she had capsular contracture, and that she needed a re-augmentation with smaller implants, soft tissue reinforcement, and a mastopexy to address the problems with her breasts.   The estimated cost for the surgery as $7,616.68.

## COUNT I – ALLERGAN AND MOJICA AIDING AND ABETTING

## THE CLAYMANS' BREACH OF FIDUCIARY DUTY AND/OR FRAUD

53.     Ms. Esquivel re-alleges and incorporates by reference paragraphs 1 through 52.

54.     Throughout the care and treatment of Ms. Esquivel, the Claymans breached their fiduciary duty to her by:

(a).     Recommending or insisting on Allergan saline implants based on his/their/its direct financial motivation, rather than making appropriate recommendations based on the best interests of the patient.

(b).     Claiming that one or more of her breast implants had ruptured, deflated, or leaked when they had not.

(c).     Performing a revision surgery on December 2, 2013, based upon an alleged spontaneous right implant rupture, deflation, or leak that did not exist, which placed her at an increased risk for surgical and anesthetic complications, and which involved simply repeating the same procedure that was previously performed.

(d).     Not performing the surgery that her physical condition actually required, in favor of surgery that took less time and skill, to allow for the removal and replacement of Allergan Natrelle saline implants under the Warranty.

55.     On one or more of the below occasions, the Claymans made the following false statements or representations, which were intended to conceal their financial and other personal

17

motivations in connection with the removal and replacement of allegedly ruptured, deflated, or leaking Allergan Natrelle saline implants, and which in fact misled Ms. Esquivel and/or others, and/or caused her to respond in the following ways to her detriment:

(a).    On November 13, 2013, Clayman Senior told Ms. Esquivel that she needed to remove and replace both of her breast implants because she had a rupture, deflation, or leak at her right breast implant.  In fact, Ms. Esquivel did not have a rupture, deflation, or leak at her either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.    These representations caused Ms. Esquivel to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than negligence by Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Esquivel did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(b).    On December 2, 2013, Clayman Senior and/or Clayman Practice staff had Ms. Esquivel sign an "Authorization for and Consent to Surgery or Therapeutic Procedures" that stated she was undergoing "Bilateral Replacement Augmentation" due to "Right Deflation…"  In fact, Ms. Esquivel did not have a rupture, deflation, or leak at her either of her breast implants, and Clayman Senior did not have the intention or ability to correct the actual problems with her breasts.  This representation caused Ms. Esquivel to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than negligence by Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon.  As a result, Ms. Esquivel did not seek a second opinion from

another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(c).    In the Operative Report and OR Record dated December 2, 2013, Clayman Senior represented to Ms. Esquivel and others that she had a "Right deflation" for which she needed to have both implants removed and replaced. In fact, Ms. Esquivel did not have a rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems she was having with her breasts. These representations caused Ms. Esquivel to conclude that the problems she was experiencing with her breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead from of a different plastic surgeon. As a result, Ms. Esquivel did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

(d).    On or about December 2, 2013, the Claymans made a warranty claim to Allergan regarding the right breast implant removed on that date. Specifically, the Claymans had Ms. Esquivel sign a warranty claim form indicating that she had a spontaneous rupture, deflation, or leak at her right breast implant due to "[p]articles in valve," for which she needed a removal and replacement procedure for both of her implants. By having Ms. Esquivel sign this claim form the Claymans represented to her and others that her breast implant had spontaneously ruptured, deflated, or leaked and needed to be replaced. In fact, Ms. Esquivel did not have a spontaneous rupture, deflation, or leak at either of her breast implants, and Clayman Senior did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Esquivel and others to conclude that the problems she was experiencing with her

breasts were the result of a defective breast implant rather than the medical negligence of Clayman Senior; these representations also caused her to agree to have another surgery by Clayman Senior instead of from a different plastic surgeon. As a result, Ms. Esquivel did not seek a second opinion from another plastic surgeon, nor did she consult with an attorney about a potential medical negligence claim.

56.    For the previously stated reasons in paragraphs 30 through 38 above, Allergan and Mojica knew that the Claymans were breaching a fiduciary duty owed to Ms. Esquivel, and/or committing fraud upon her. Despite this knowledge, Allergan and Mojica provided substantial assistance to the Claymans in committing fraud against Ms. Esquivel, and/or breaching a fiduciary duty owed to her, in one or more of the following ways:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Esquivel was a patient of the Claymans; and

(b).    Ensuring payment of the warranty claim of the Claymans in relation to the right saline implant that Clayman Senior placed into Ms. Esquivel on March 29, 2013, and which Clayman Senior surgically removed on December 2, 2013.

57.    As a direct and proximate result of the substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Esquivel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

58.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan and Mojica to the Claymans, Ms. Esquivel has spent monies in the amount of $3,750 or more, for medical and/or surgical care by the Claymans that was of no

20

value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **RUTH CATHERINE ESQUIVEL**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT II – ALLERGAN, MOJICA, AND THE CLAYMANS' CONSPIRACY TO COMMIT BREACH OF FIDUCIARY DUTY AND/OR FRAUD

59.    Ms. Esquivel re-alleges and incorporates by reference paragraphs 1 through 52, 54, and 55.

60.    On or before April 2, 2009, Allergan, Mojica, and the Claymans entered into an agreement to commit one or more breaches of a fiduciary duty and/or fraud in relation to the Claymans' patients.  The acts and conduct illustrative of the parties' intent to enter into this agreement are alleged in paragraphs 30 through 38 above.  Furthermore, Mojica had a personal stake in the activities of the conspiracy that was separate from Allergan's interests in the conspiracy, i.e. his personal advancement within the company and individual incentive pay and/or commissions.

61.    Allergan and Mojica committed one or more of the following overt acts in furtherance of the conspiracy to breach a fiduciary duty and/or to commit fraud:

(a).    Continuing to sell saline breast implants to the Claymans while Ms. Esquivel was a patient of the Claymans;

(b).    Ensuring payment of the warranty claim of the Claymans in relation to the right saline implant that Clayman Senior placed into Ms. Esquivel on March 29, 2013, and which Clayman Senior surgically removed on December 2, 2013.

62.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty, Ms. Esquivel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

63.    Furthermore, as a direct and proximate result of the above noted conspiracy to breach a fiduciary duty and/or to commit fraud, Ms. Esquivel has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff, **RUTH CATHERINE ESQUIVEL**, demands judgment for compensatory damages against the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT III – FLORIDA CIVIL RICO AND REMEDIES
## FOR CRIMINAL ACTIVITIES – CONSPIRACY

64.    Ms. Esquivel re-alleges and incorporates by reference paragraphs 1 through 52, 54, and 55.

65.    Allergan and Mojica violated sections 772.103(4) and 895.04(4), *Florida Statutes*, by conspiring with the Claymans to violate sections 772.103(3) and 895.03(3), respectively.

66.    In connection with the fraudulent scheme, Allergan, Mojica, and the Claymans agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

22

67.     Allergan, Mojica, and the Claymans agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

68.     The predicate acts of Allergan, Mojica, and/or the Claymans began at an unknown date, and involved hundreds of the Claymans' breast implant patients.

69.     The predicate acts of Allergan, Mojica, and/or the Claymans continued to occur against the Claymans' breast implant patients at least until October 26, 2017.

70.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Esquivel suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

71.     Furthermore, as a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Ms. Esquivel has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Clayman Senior and/or the Clayman Practice that was of no value, and which has caused her to have to incur future medical expenses to correct the damages done by said medical and/or surgical care.

72.     Despite her diligence and efforts, Ms. Esquivel's discovery of these ongoing injuries was delayed by Allergan, Mojica, and/or the Claymans' fraudulent concealment activity.

73.     As a result of the foregoing, Ms. Esquivel has had to hire the undersigned attorney and his law firm, and has agreed to pay him/them a reasonable fee for their services.

74.     Pursuant to section 772.104, *Florida Statutes*, Ms. Esquivel is entitled to recover treble damages plus costs and attorney's fees from Allergan and Mojica.

WHEREFORE, the Plaintiff, **RUTH CATHERINE ESQUIVEL**, pursuant to Section 895.05, *Florida Statutes*, demands judgment for treble actual and consequential damages arising from the conduct of the Defendants, **ALLERGAN SALES, LLC** and **RICARDO E. MOJICA**, an award of costs and all reasonable attorneys' fees, and the following additional remedies:

A.     A preliminary injunction prohibiting similar conduct by the Defendants in the State of Florida;

B.     A permanent injunction prohibiting similar conduct by the Defendants in the State of Florida;

C.     Revocation of the certificate authorizing the Defendant, **ALLERGAN SALES, LLC**, to do business in the State of Florida;

D.     Forfeiture of all monies and real and personal property received or obtained by the Defendants as a result of the acts alleged in this Count, and the Plaintiff, **RUTH CATHERINE ESQUIVEL**, will have a claim for any and all such forfeited monies and real and personal property;

E.     A civil penalty against the Defendant, **RICARDO E. MOJICA**, in the amount of $100,000;

F.     A civil penalty against the Defendant, **ALLERGAN SALES, LLC,** in the amount of $1,000,000; and

G.     Any further relief the Court deems just and proper.

Dated this 1st day of April, 2020.

/s/ Christopher Shakib_____
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida 32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049

Primary Email: shakib@terrellhogan.com
Secondary Email: jfleury@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiff